UNITED STATES v. HYDE et al.

(District Court, N. D. California. September 2, 1904.)

No. 4,198.

1. CONSPIRACY TO DEFRAUD UNITED STATES—ACTS CONSTITUTING OFFENSE.

An indictment charges a conspiracy to defraud the United States, within Rev. St. § 5440 [U. S. Comp. St. 1901, p. 3676], where it avers that defendants conspired to obtain the legal title to school lands within public forest reservations from certain states by means of acts and representations set out, and which are of such fraudulent character that the equitable title to such lands would remain in the states, and to then exchange such lands for public lands of the United States, under the provisions of Act June 4, 1897, c. 2, § 1, 30 Stat. 36 [U. S. Comp. St. 1901, p. 1541], which authorize such exchanges, but which contemplate that the government shall obtain the full, fee-simple title to the lands for which it makes the exchange, including the equitable as well as the legal title.

2. CRIMINAL LAW—REMOVAL OF PRISONER TO DISTRICT OF COLUMBIA.

Rev. St. § 1014 [U. S. Comp. St. 1901, p. 716], when construed in connection with Act Feb. 21, 1871, c. 62, 16 Stat. 426, providing that all laws not locally inapplicable shall have the same force and effect within the District of Columbia as elsewhere within the United States, confers authority for the removal of a federal prisoner from another judicial district to the District of Columbia for trial on an indictment there found.

On Application of the United States for the Removal for Trial of Frederick A. Hyde and Henry P. Dimond from the Northern District of California to the District of Columbia.

Francis J. Heney, Sp. Asst. Atty. Gen., and Arthur B. Pugh and Oliver E. Pagin, Sp. Asst. U. S. Attys., and Marshal B. Woodworth, U. S. Atty.

Garret W. McEnerney and Bert Schlesinger, for defendant Frederick A. Hyde.

Samuel Knight, for defendant Henry P. Dimond.

DE HAVEN, District Judge. This is an application under section 1014 of the Revised Statutes [U. S. Comp. St. 1901, p. 716], for a warrant to remove the defendants Hyde and Dimond from the Northern District of California to the District of Columbia for trial upon an indictment found by the grand jury of the Supreme Court of that District. The indictment contains 42 counts. The first is the only one that it will be necessary to consider. It is therein charged that on December 30, 1901, Frederick A. Hyde, John A. Benson, Henry P. Dimond, and Joost H. Schneider entered into a conspiracy in the District of Columbia to defraud the government of the United States out of its title to large tracts of the public lands open to selection under the laws of the United States, in

132 F.—35

lieu of lands included within the limits of forest reservations established and to be established in the states of California and Oregon; that the object of this conspiracy was to be accomplished "by means of a false and fraudulent practice, whereby the said Frederick A. Hyde and John A. Benson were to obtain fraudulently from the said states of California and Oregon title to and possession of school lands lying within the limits of such forest reserves, and open to purchase from those states by residents thereof, respectively, * * * upon application being made to the proper authorities of the said states, respectively, by any such resident, supported by his affidavit, showing * * * his intention to purchase such lands in good faith and for his own benefit, and that he has made no contract or arrangement to sell the same, which said school lands were to be so obtained from the said states by making and filing with the said authorities applications for the purchase of the same, and assignments of the same, and of the certificates of purchase thereof, in the names of fictitious persons, and in the names of persons not really desiring and not qualified to purchase the same, * * * and by supporting such applications with forged and fraudulent affidavits and affidavits false, and known to the said Frederick A. Hyde and John A. Benson to be false," in the statement of facts, showing the qualifications and right of such applicants to purchase the same, under the law, "whereby the said Frederick A. Hyde and John A. Benson were to cause to be relinquished, * * * by means of false and forged * * * conveyances, to the said United States, either directly or indirectly, either through the said Frederick A. Hyde, or through divers agents and attorneys of the said Frederick A. Hyde and John A. Benson, * * * as would be found convenient or necessary, the pretended rights of such fictitious persons, respectively, and require and procure such real persons to make * * * conveyances, either directly or indirectly, * * * to the said United States, of the titles to and possession of such school lands so by the use of the names of such real persons fraudulently to be obtained from the said states, and this, in either case, in exchange as aforesaid of public lands to be selected, and for titles thereto by patent to be obtained, by and on behalf of the said Frederick A. Hyde and John A. Benson, in the names of such fictitious or real persons, or in the names of the said Frederick A. Hyde, * * * as would be found convenient or necessary, from the public lands of the United States, in lieu of such lands lying within the limits of such forest reserves as aforesaid.".

1. The defendants resist removal, and insist that the facts set out in the indictment do not sufficiently charge them with a conspiracy to defraud the United States, within the meaning of section 5440 of the Revised Statutes [U. S. Comp. St. 1901, p. 3676]. It is well settled that, in an application for a warrant of removal under section 1014 of the Revised Statutes [U. S. Comp. St. 1901, p. 716], it is the duty of the judge to inquire into the sufficiency of the indictment, when the application for removal is based upon the indictment alone, and, if in such case the indictment does not charge an offense, the warrant should be refused. The first question then

for consideration at this time is that which relates to the sufficiency of the indictment. Do the facts set forth in the first count show that defendants entered into a conspiracy to defraud the United States out of the title to any of its public lands? It is claimed by the government that the indictment should be construed as charging, in addition to other matters, that the defendants conspired together to obtain from the states of California and Oregon patents for school lands in the names of fictitious persons, and then to exchange the apparent title so obtained for lands of the United States, and, for the purpose of effecting such exchange, were to give to the United States forged conveyances executed in the names of such fictitious patentees, purporting to convey to the United States land covered by such patents, and also deeds executed by apparent grantees of such fictitious persons, purporting to convey to the United States other portions of such patented land. If such is the true construction of the indictment, there can be no doubt that it sufficiently charges the defendants with a conspiracy to defraud the United States out of the title to the lands which it might give in exchange for such fictitious titles, for in the case of such an exchange the government would receive no title at all to the lands apparently conveyed to it. A patent issued in the name of a fictitious person conveys no title. It is not simply voidable, but is absolutely void. Moffat v. United States, 112 U. S. 24, 5 Sup. Ct. 10, 28 L. Ed. 623; United States v. Southern Colorado Coal & Town Co. (C. C.) 18 Fed. 273. The title to the lands covered by such void patents would therefore still remain with the states which issued them. But it is not clear that the contention of the government as to the construction of the indictment in this respect can be sustained. Its most direct and certain allegation is that the conspiracy contemplated that the defendants "Frederick A. Hyde and John A. Benson were to obtain fraudulently from the said states of California and Oregon title to and possession of school lands lying within the limits of forest reserves open to purchase from those states." The indictment then proceeds to set forth that one of the ways by which such title was to be fraudulently acquired was for Hyde and Benson to make and file "with the said authorities applications for the purchase of the same, and assignments of the same, and of the certificates of purchase thereof, in the names of fictitious persons." If this allegation means anything at all, it is that the applications were to be fraudulently made in the names of fictitious persons, and that purported assignments of the certificates of purchase issued thereon should also be filed with the authorities of the state. In that event the patent would issue to the person named as assignee in such fictitious assignment, and the legal title would also pass to him. It is not directly alleged that the defendants were to obtain any patent from either of the states referred to in which a fictitious person should be named as grantee, although it must be conceded there is an averment which seems to imply, and from which it may be argued with much force, that patents of that character were to be obtained; but the direct and specific allegations above quoted are the controlling ones, in reference to the use of fictitious names

in acquiring title to lands belonging to the states. The indictment is certainly subject to very severe criticism because of lack of precision and singleness in its statement of facts, but I think that, upon consideration of all of its allegations, the first count may be construed as charging, in substance, that the defendants entered into a conspiracy to obtain from the United States title to vacant public lands in exchange for school lands within forest reservations, the title to which was to be fraudulently obtained from California and Oregon by the defendants Hyde and Benson in the names of persons whose applications to purchase were to be supported by the false and fraudulent affidavits referred to in the indictment; and upon applications filed in the names of fictitious persons, and purported assignments of the rights of such fictitious persons to patents. It will thus be seen that the object of the alleged conspiracy was to enable the defendants Hyde and Benson to obtain from the United States a perfect title to certain of its public lands in exchange for school lands situate in forest reservations to which they held only the naked legal title, the equitable title thereto being either in the state of California or the state of Oregon. Upon the part of the defendants it is insisted that effecting such exchange of land in the manner and under the circumstances set forth in the indictment would not be a fraud upon the United States, for the reason that in such transaction the government would be an innocent purchaser, and therefore receive a perfect title to the lands conveyed to it. The soundness of this proposition cannot be conceded. The law under which the exchange of lands referred to in the indictment was to be made is as follows:

"That in cases in which a tract covered by an unperfected bona fide claim or by a patent is included within the limits of a public forest reservation, the settler or owner thereof may, if he desires to do so, relinquish the tract to the government, and may select in lieu thereof a tract of vacant land open to settlement not exceeding in area the tract covered by his claim or patent." Act June 4, 1897, c. 2, § 1, 30 Stat. 36 [U. S. Comp. St. 1901, p. 1541].

This constitutes an offer upon the part of the government to exchange its vacant lands open to settlement, acre for acre, for land included within forest reservations, held in private ownership, or to which an unperfected bona fide claim has attached; and, so far as relates to land covered by patent, the offer is made to the owners of such land and to no other persons. Who, then, is to be regarded as the owner of land covered by patent, within the meaning of this statute? To my mind it is clear that the word "owner," as therein used, refers only to one who holds both the legal and equitable title to the patented land. It cannot be doubted that if a person applying to exchange lands under this statute should, at the time of tendering his conveyance to the government, inform the officers of the Land Department that the title which he proposed to relinquish was one which he had obtained by the perpetration of such frauds as are described in the indictment, and that therefore there was an outstanding superior equitable title, or, if knowledge of that fact was obtained by them from any source, the officers of the Land Department could not, without violation of this statute, accept such fraudulent

and imperfect title in exchange for public lands of the United States. It would be the duty of the Land Department to reject such an application, because a title which in the hands of the person relinquishing it is tainted with fraud, and therefore voidable, is not the kind of title which the law contemplates the government shall receive in exchange for its lands. If this is the proper construction of the statute, then it necessarily follows that no one can obtain the benefit of its provisions without making an express or implied representation that he is the owner, both in law and in equity, of the land which he tenders to the United States in exchange. If such representation is not true, and was known to be false when made, it would constitute a fraudulent representation, such as would entitle the government to a cancellation of the patent issued upon the faith thereof; and it would be no answer to a bill filed for that purpose to say that the government, although deceived by the representation, and thereby induced to part with the title to its land, was not defrauded, because it might be able to protect itself from loss or damage by showing that it did not have at the time of making the exchange notice of an outstanding equitable title to the lands received by it. The government is defrauded when it is induced to issue a patent for public land by the fraudulent representation of a fact which under the law is material to the transaction, and without which the patent would not have issued; and the representation by one seeking the benefit of this statute that he is the legal and equitable owner of the land which he proposes to relinquish to the United States, is material, because, as before stated, it was not the intention of Congress, in the enactment of this law, that the government should deal with any other persons than those having a complete and perfect title to the land conveyed by them in exchange for the public lands of the United States. It may be stated as an elementary principle of law that one who has been induced by fraudulent representations to enter into a contract, which he would not have done except for such representations, is entitled to rescind such contract because of the fraud thus practiced upon him. Thus in the case of Mac-Laren v. Cochran, 44 Minn. 255, 46 N. W. 408, it was said:

"If a party is induced to enter into a contract by fraudulent representations as to a fact which he deems material, and upon which he has a right to rely, he may rescind the contract upon discovery of the fraud, and the party in the wrong should not be heard to say that no real injury can result from the fact misrepresented."

And in McAleer v. Horsey, 35 Md. 439, in discussing the question as to what false representations will be deemed material, it is said:

"No better rule can be given for deciding the question than this: If the fraud be such that, had it not been practiced, the contract would not have been made or the transaction completed, then it is material to it; but, if it be shown or made probable that the same thing would have been done in the same way if the fraud had not been practiced, it cannot be deemed material."

In speaking of the implied representation which is made by one who tenders to the government a deed of land which he desires to exchange for public lands under this statute, the Supreme Court, in

Cosmos Exploration Company v. Gray Eagle Oil Co., 190 U. S. 301, 23 Sup. Ct. 692, 24 Sup. Ct. 860, 47 L. Ed. 1064, say:

"So far as his action goes, it is an assertion upon his part that he is the owner in fee simple of the land he proposed to relinquish, and that the deed conveys a fee-simple title to the government, and also 'that he has selected vacant land which is open to settlement, and that therefore he is entitled to a patent for such land."

But one cannot truthfully assert that he is the owner of land in fee simple when he knows there is outstanding in another a superior equitable title thereto. Ownership in fee simple implies something more than being the holder of the naked legal title to land. It implies an indefeasible legal title—the entire title and estate in land—or,. as it is sometimes defined, "An estate in fee simple is the greatest estate or interest which a person can possess in landed property." 11 Am. & Eng. Ency. (2d Ed.) p. 366. And it was in this sense that the words "fee-simple title" are used by the Supreme Court in the above extract.

My conclusion, therefore, upon this point, is that the defendants, in combining together to obtain the title to public lands of the United States in exchange for lands to which they held only the naked legal title—the equitable title thereto being in the states of California and Oregon—conspired to defraud the United States, within the meaning of section 5440 of the Revised Statutes [U. S. Comp. St. 1901, p. 3676].

2. The defendants also resist removal upon the ground that section 1014 of the Revised Statutes [U. S. Comp. St. 1901, p. 716] does not authorize the removal of a defendant from one judicial district of the United States to the District of Columbia for trial. This question was presented in the cases of In re Buell, 3 Dill. 116, Fed. Cas. No. 2,102, and In re Benson (C. C.) 130 Fed. 486, and it was held in both that section 1014 of the Revised Statutes [U. S. Comp. St. 1901, p. 716], when read in connection with other statutes of the United States, gives ample authority for such removal; and Judge Dillon, delivering the opinion of the court in the first case, used the following language, which I adopt as an expression of my own views:

"The District of Columbia is not a sanctuary to which persons committing offenses against the United States may fly and be beyond the reach of justice, nor is the law so defective that persons there committing such offenses, and escaping or found elsewhere, cannot be taken back there for trial."

I do not deem it necessary to discuss other questions presented in the briefs of counsel—many of them, such as those going to the mere form of the indictment, being for the exclusive determination of the court in which the indictment was found. The others have been fully considered, and it will be sufficient to say of them that, in my judgment, they are not sufficient to justify me in refusing to issue the warrant applied for.

Application for warrant of removal granted.